# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| Nora Jean Farias, Administrator of the Estate of | § | |
| Larry E. Jackson II, | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 6:16-cv-19 |
| vs. | § | |
| | § | |
| Eric Christensen (in his individual capacity), | § | |
| Sgt. Brown (in his individual capacity), and | § | |
| John Rupert (in his individual capacity), | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT SITTING IN  THE EASTERN DISTRICT OF TEXAS:

Plaintiff respectfully comes before this Honorable Court complaining pursuant to 42 U.S.C. § 1983 that Defendants herein acted under color of state law and unreasonably deprived decedent Larry Eugene Jackson II ["Mr. Jackson"] of his clearly established constitutional rights to (1) reasonable medical treatment and (2) remain free from arbitrary punishment.  Specifically, Mr. Jackson ceaselessly suffered from untreated diabetic ketoacidosis over the course of approximately nine hours while imprisoned in Defendants' custody until he unnecessarily died therefrom.  At all times relevant hereto, Defendants unreasonably refused to provide Mr. Jackson with a scintilla of medical attention until he stopped breathing despite the facts that (1) a fellow inmate repeatedly brought Mr. Jackson's deteriorating condition and need for life-saving medical care the attention of Defendants Christensen and Brown and (2) multiple guards saw Mr. Jackson's deteriorating condition in his cell over the course of approximately nine hours.  In support thereof, Plaintiff specifically alleges the following:

## I.      NATURE OF THE ACTION

1.  This suit arises primarily under the Constitution of the United States (particularly the Fourth and Fourteenth Amendments thereto) and the laws of the United States (particularly 42 U.S.C. § 1983).

## II.      SUMMARY OF THE ACTION

2.  Mr. Jackson suffered a seizure in Defendants' custody as a result of diabetic ketoacidosis that resulted in his death.

3.  Mr. Jackson's unreasonably prolonged and treatable suffering took place over approximately 9 hours.

4.  Defendants Christensen and Brown knew Mr. Jackson required medical care.

5.  Defendants Christensen and Brown unreasonably failed/refused to provide Mr. Jackson with medical care until he stopped breathing.

6.  Defendants Christensen and Brown failed/refused to provide Mr. Jackson with reasonable medical care because they:

    a.  were deliberately indifferent to Mr. Jackson's medical needs;

    b.  believed Mr. Jackson was faking;

    c.  believed Mr. Jackson had consumed an illicit substance; and/or

    d.  did not have gloves with them.

7.  Defendant Rupert's deliberately indifferent failure or refusal to supervise and/or train his correctional officers to (1) identify inmates who require life-saving medical care and/or (2) reasonably provide life-saving medical care to inmates who require it permitted

Defendants Christensen and Brown to unreasonably avoid providing Mr. Jackson with life-saving medical care over the course of approximately 9 hours.

8.  Defendants' conduct and failures to act caused Mr. Jackson's death.


### III.    DEMAND FOR JURY TRIAL

9.  Plaintiff respectfully demands a trial by jury.


### IV.    PARTIES

10. Plaintiff Nora Jean Farias, administrator of the estate of Larry E. Jackson II, was at all times relevant hereto an individual residing in the United States.  She can be served through her attorney of record, Meagan Hassan, DEMOND & HASSAN, PLLC, 2450 Louisiana St, #400-528, Houston, TX 77006.

11. Defendant Officer Eric Christiansen was at all times relevant hereto an individual residing in the United States.   He is believed to be residing in Texas and may be served wherever he may be found.

12. Defendant Sergeant Brown was at all times relevant hereto an individual residing in the United States.   He is believed to be residing in Texas and may be served wherever he may be found.

13. Defendant Warden John Rupert was at all times relevant hereto an individual residing in the United States.  At all times relevant to this lawsuit, he was the warden of the H.H. Coffield Unit of the Texas Department of Criminal Justice, and may be served at same, located at 2661 FM 2054, Tennessee Colony, TX 75884.

## V.     JURISDICTION AND VENUE

14. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a) (3) and (4) because Plaintiff's suit arises under 42 U.S.C. § 1983.

15. Venue is proper under 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Texas, Tyler Division.

16. All conditions precedent have been performed or have occurred.


## VI.     FACTS

A. EARLY MORNING

17.    On January 16, 2014:

    a. Mr. Jackson was in his cell on the third floor of the Coffield Unit;

    b. Randall Laster ["Laster"] was an inmate imprisoned adjacent to Mr. Jackson;

    c. Mr. Jackson was drinking a considerable amount of bottled water;

    d. Mr. Jackson told Laster that he was dizzy and could not stand up straight;

    e. Mr. Jackson was slurring his speech and did not appear to be able to stand up;

    f. Laster personally told Defendant Christensen (a white male correctional officer on duty) that Mr. Jackson was sick;

    g. Defendant Christensen responded by saying that Mr. Jackson was probably on drugs; and

    h. Defendants Christensen and Brown did not provide Mr. Jackson with any medical attention.

B. 11 A.M.

18. Around 11 a.m., Mr. Jackson was lying on his bed and shaking (as if chilled).

19. Mr. Jackson:

   a. was incoherent;

   b. drooling from his mouth;

   c. sweating; and

   d. did not appear capable of standing.

20. Laster again told Defendant Christensen that Mr. Jackson was sick.

21. Laster emphasized to Defendant Christensen that Mr. Jackson was very sick.

22. Later (but before lunch time), Laster went with Defendant Christensen to Defendant Brown.

23. Defendant Christensen then reported Mr. Jackson's illness to Defendant Brown (a black male sergeant on duty).

24. Defendant Brown was the sergeant on duty in that area of the jail at that time.

25. Defendant Christensen specifically reported to Defendant Brown that Mr. Jackson was sick and sweating.

26. Defendant Brown said he would call for medical assistance after the prisoners had eaten.

27. Laster responded and said something to the effect of, "Hey, this guy is really sick."

28. At this time, it was obvious to laypersons without medical training that Mr. Jackson required timely medical attention.

29. Defendant Brown then told Laster: "Get the fuck out of my face; I'll get medical after chow."

C. Post-lunch

30.     After lunch:

    a.  Mr. Jackson was sweating profusely in his bed;

    b.  it was plainly obvious to laypersons without medical training that Mr. Jackson needed immediate medical attention;

    c.  Mr. Jackson's speech was limited to single words;

    d.  Mr. Jackson was not capable of responding to Laster's questions or comments;

    e.  Laster went to the rotunda in the center of the unit and reported Mr. Jackson's illness and need for medical attention to the officer on duty;

    f.  The female officer on duty said, "You mean they have not taken him to medical yet?";

    g.  Laster told her no one had taken Mr. Jackson to medical and no one had come to see him;

    h.  The female officer told Laster that she would call Defendant Brown; and

    i.  The female officer walked away from the screen to call Defendant Brown.

31. When the female officer returned, she told Laster that:

    a.  Defendant Brown said he had already talked to Defendant Christensen; and

    b.  Defendant Brown would address Mr. Jackson's need for medical care when he got a chance.

32.     Laster went back to his cell and waited.

33.     A while later, Defendant Christensen came back on his round.

34.   At this time Jackson:

    a.   was extremely ill;

    b.   was lying on his bed;

    c.   was still sweating;

    d.   was incapable of responding to any questions; and

    e.   in clear and obvious need of immediate medical attention.

35.   Defendant Christensen said he needed to finish his security rounds and would then contact medical.

36.   Laster waited a while and no medical came.

37.   Laster then had to go to dinner.

38.   Laster came back from dinner sometime after five o'clock p.m.


D.   5 P.M.

39.   Shortly after 5:00 pm (when Laster returned from dinner), Jackson was:

    a.   extremely ill;

    b.   lying on his bed;

    c.   sweating;

    d.   incapable of responding to questions; and

    e.   in desperate need of immediate medical attention.

40.   Approximately 9 hours had passed since Laster made his first request for medical assistance.

41.   Between 5 and 6 hours had passed since Laster made his second request for medical assistance.

42. Approximately 2 to 3 hours had passed since Laster made his third request for medical assistance.

43. Approximately 1 to 2 hours had passed since Laster made his fourth request for medical assistance.

44. At this time, it was obvious to laypersons without medical training that Mr. Jackson required immediate medical attention.

45. Mr. Jackson was:

    a.   in his bed shaking violently;

    b.   discharging blood from his mouth;

    c.   discharging foam from his mouth; and

    d.   gasping for air through clenched teeth.

46. It appeared that Mr. Jackson was having a seizure.

47. Laster again told Defendant Christensen that Mr. Jackson needed medical care.

48. Defendant Christensen then called Defendant Brown.

49. Defendant Brown arrived approximately two or three minutes later.

50. When Defendant Brown arrived, he picked up a dirty plastic spoon from Mr. Jackson's bed and attempted to jam it into Mr. Jackson's mouth.

51. Defendant Brown then put the spoon down and appeared to call medical on the radio.

52. Defendant Brown's actions damaged Mr. Jackson's gums and caused him to bleed.

53. When additional jail personnel arrived, at least one person began videotaping the incident.

54. Videotaping incidents like the one described herein was the policy, procedure, practice, custom, or protocol within the Coffield Unit on January 16, 2014.

55.     Shortly after the arrival of additional jail personnel, Mr. Jackson stopped breathing.

56.     Defendant Brown then reported on the radio that the "inmate has stopped breathing."

57.     Laster informed Defendant Brown that Mr. Jackson required CPR.

58.     Defendant Brown replied that he could not give Mr. Jackson CPR because he did not have plastic gloves.

59.     Similarly, Defendant Christensen did not attempt to give Mr. Jackson CPR.


       E.   MR. JACKSON IS MOVED

60.     Laster then picked up Mr. Jackson's feet to move him out into the hall.

61.     Defendants Christensen and Brown picked up Jackson by his arms (one on each side) and began to move Mr. Jackson into the hallway.

62.     Defendants Christensen and Brown let go of Mr. Jackson's arms and dropped him on his head.

63.     Laster observed Jackson's head hit the floor hard.

64.     Laster could hear the inmates on the floor above yell "Damn, what did y'all do? Drop him on his head?"

65.     Laster then moved Mr. Jackson into the hallway by himself.

66.     Laster then started performing chest compressions on Mr. Jackson.

67.     Mr. Jackson took a few breaths and then stopped breathing altogether.

68.     Laster again began doing chest compressions.

F.  ARRIVAL OF MEDICAL PERSONNEL

69.     Medical personnel arrived approximately five to ten minutes later while Laster was performing chest compressions on Mr. Jackson.

70.     No correctional personnel provided Mr. Jackson with medical care of any type prior to the arrival of medical personnel.

71.     The medical personnel put Mr. Jackson on a gurney and took him away.

72.     Upon information and belief, the medical personnel who responded:

    a.   were located approximately a quarter of a mile away from Mr. Jackson's location;

    b.   were unable to utilize a particular elevator between Mr. Jackson's cell and the jail's exit;

    c.   used a stairwell en route to the jail's exit; and

    d.   became stuck in said stairwell.

73.     After dislodging themselves from the stairwell, medical personnel took Mr. Jackson to Palestine Regional Medical Center and Rehabilitation Hospital.

74.     Palestine Regional Medical Center and Rehabilitation Hospital is approximately twenty miles away from the Coffield Unit.

75.     Mr. Jackson was pronounced deceased at 2:08 pm on January 18, 2014.

76.     Diabetic ketoacidosis is not fatal if treated via reasonable medical care.


G.  AUTOPSY RESULTS

77.     The final autopsy report reflects the following:

    a.   Cardiopulmonary resuscitation (CPR) was initiated;

    b.   Emergency Medical Services was called for transport;

c.  Basic and advanced life support were initiated [BLS and ACLS];

d.  Mr. Jackson was taken to Palestine Regional hospital;

e.  Mr. Jackson regained a pulse at 19:13 in the hospital's emergency room;

f.  CPR time was 103 Minutes;

g.  Mr. Jackson was transferred to ICU;

h.  Mr. Jackson was then medically stabilized, placed on dopamine for pressure support, and was on 100 percent oxygen via ventilation;

i.  the initial lab showed hyperglycemia with a combination of profound metabolic and respiratory acidosis;

j.  Mr. Jackson also had mild hypokalemia, hyponatrernia, and leukocytosis;

k.  lab results showed:

    (i)  pH 6.8, PC02 62 mm/Hg;

    (ii)  P02 150 mm/Hg;

    (iii)  HC03 9.3 meq/l;

    (iv)  base excess of negative 22.1 meq/l;

    (v)  sodium 123 mmol/l;

    (vi)  potassium 3.4 mmol/1;

    (vii)  glucose 506 rng/dl;

    (viii)  creatinine kinase myocardial band 50.5 ng/ml;

    (ix)  troponin 3.17 ng/ml;

    (x)  white blood count 20,000/ul;

    (xi)  AST 114 u/l; and

    (xii)  ALT 101 u/l;

l.   Mr. Jackson's toxicity screen was negative (including methadone, cocaine, tetrahydrocannabinol (THC), barbiturate, benzodiazepine, opiate, amphetamine, and phencyclidine);

m.   Mr. Jackson's EKG showed. prolonged QT interval but no change diagnostic of acute cardiac injury;

n.   Mr. Jackson's chest X-ray showed perihilar fullness consistent with congestive heart failure;

o.   Mr. Jackson never regained reflexes;

p.   Mr. Jackson's CT showed mild cerebral edema;

q.   Mr. Jackson's EEG showed electrocerebral silence, consistent with brain death; and

r.   Mr. Jackson's kidneys were harvested for transplantation.

H.  LASTER IS INTERVIEWED

78.   Laster was subsequently interviewed by a man from the Office of the Inspector General ["OIG"].

79.   Said inspector subsequently told Laster that everyone "from the Warden on down" had "screwed up" and did not do their job with respect to Mr. Jackson's death.

80.   A few days later, Defendant Christensen told Laster that he was sorry and that if he had acted differently, Mr. Jackson might not have died.

81.   Laster was subsequently transferred to James V. Allred Unit near Wichita Falls, Texas.

I. Defendant Rupert's Culpability

82. A not-insignificant number of inmates have died while in custody at the H.H. Coffield Unit (both before and during Defendant's term as warden therein); Plaintiffs aver this specific fact is likely to have evidentiary support after a reasonable opportunity for discovery.

83. As Warden of the H.H. Coffield Unit, Defendant Rupert has the responsibility to ensure, to the best of his ability, the safety of the inmates that are assigned thereto.

84. Defendant Rupert is supposed to fulfill this responsibility by training and supervising the correctional officers that are employed therein.

85. Specifically, Defendant is supposed to train and supervise his correctional officers concerning the ways to recognize, identify, and respond to inmates who are obviously dying and/or in need of life-saving medical care.

86. Defendant Rupert was actually aware of his correctional officers' nonresponsiveness to inmates' need for life-saving medical care.

87. Specifically, inmates have died from heat stroke while incarcerated at the Coffield Unit; for example, Thomas Myers died on August 3, 2011 at the age of 46 years old.

88. A not-insignificant inmates have complained of chest pain and heat stroke, have been given Tylenol, aspirin, or basic cold remedies, and have unnecessarily died shortly thereafter from a lack of medical care.

89. Such care in response to chest pain and heat stroke does not constitute constitutionally adequate medical care and Defendant Rupert knows, should know, or must know same.

90. Defendant Rupert personally performed a mandatory "walk-through" of the facility at least once every 2 months.

91.  These walk-throughs gave Defendant Rupert the opportunity to view the inmates' living conditions and potential avenues for training/supervising concerning the proper ways to respond to inevitable and predictable inmate medical crises.

92.  Defendant Rupert chose to implement or continue an institutional framework in which:

   a.  correctional officers and inmates could not appeal to someone besides their immediate superior to procure life-saving medical care for an obviously ill inmate; and

   b.  correctional officers were not reasonably trained concerning the proper steps to take when a dying inmate required life-saving medical attention and a supervisor failed or refused to provide said attention.

93.  Despite having actual notice of these unconstitutional conditions, Defendant Rupert chose to refrain from training/supervising his subordinates concerning the proper way to respond when confronted with an inmate who appeared to be in a life-threatening medical situation and/or a supervisor who failed/refused to provide reasonable medical care.

94.  Since 2013, over 290 inmates have died in TDCJ custody at Tennessee Colony.

95.  Defendant Rupert is actually aware that there have been at least several deaths in the H.H. Coffield Unit since 2011 that could have been prevented if the officers monitoring the prisoners had adequate training/supervision concerning the proper way to respond when they viewed an inmate visibly suffering from a life-threatening medical condition (*e.g.* heatstroke deaths).

96.  Defendant Rupert is actually aware of this fact because each custodial death is carefully documented via the preparation of a "death packet", which contains, *inter alia*, interviews with witnesses, medical records, and video of the incident when available.

97.   Even in the instant case, Defendant Rupert personally interviewed Laster mere hours after Mr. Jackson was removed from his cell.

98.   Defendant Rupert specifically questioned Laster as to (*inter alia*) whom he had informed about Mr. Jackson's condition throughout the day, when Mr. Jackson had become ill, and whether Laster knew if Mr. Jackson was doing drugs that might have caused his condition.

99.   Defendant Rupert was intimately involved in the process of determining the cause of inmate deaths in his Unit.

100.  Despite Defendant Rupert's involvement and knowledge, he took no meaningful action to ensure that his correctional officers were properly supervised/trained in a manner that ensured inmates at the Coffield Unit received acceptable medical care; Plaintiffs aver this specific fact is likely to have evidentiary support after a reasonable opportunity for discovery.

101.  As a result, Defendant Rupert knew to an absolute certainty that his jailors:

   a.   would be confronted with inmates who were in critical need of life-saving medical care;

   b.   were confronted with inmates who had a critical need for life-saving medical care;

   c.   were inadequately supervised and/or trained in a manner that permitted them to reasonably identify inmates' needs for critical medical care;

   d.   failed to provide inmates with medical care in a reasonably timely manner;

   e.   failed to provide inmates with adequate medical care at all (often prescribing only Tylenol or aspirin for life-threatening conditions); and

    f.   acted or failed to act in a manner that prevented inmates at the Coffield Unit from unnecessarily suffering and/or dying from treatable conditions.

102.    At all relevant times hereto, it was not uncommon for the correctional officers and supervisors at the H.H. Coffield Unit to:

    a.   mock patients suffering from illnesses;

    b.   unreasonably delay treatment to inmates who requested it; and/or

    c.   ignore pleas for help from inmates who were attempting to be treated or were attempting to get treatment for other, obviously ill inmates who were unable to request help for themselves.

103.    Defendant Rupert created or approved the dangerous conditions which proximately caused Mr. Jackson's death (specifically, his officers' continued failures or refusals to provide reasonable medical care – let alone any medical care – to dying inmates) and refused to remedy same.

## VII.   CAUSES OF ACTION

### CLAIM 1 – 42 U.S.C. § 1983
### Defendants created unconstitutional conditions of confinement
### which caused Mr. Jackson's death

104.    The foregoing paragraphs are incorporated herein as if quoted verbatim.

105.    Defendants violated their duties under the Eighth and Fourteenth Amendments to the United States Constitution to provide Mr. Jackson with conditions of confinement that reasonably accommodated his plainly obvious medical needs, thereby making them liable to Plaintiff under 42 U.S.C. § 1983.

106.    At all times relevant hereto, Mr. Jackson had an objectively serious and readily identifiable need for medical care.

107.    Defendants':

    a.  affirmative exercise of power over and restraint of Mr. Jackson's liberty rendered him unable to care for himself;

    b.  failure/refusal to provide Mr. Jackson with the basic human need for reasonable life-saving medical care transgressed the substantive limits on state action as set forth by Eighth Amendment and Due Process Clause;

    c.  acts and/or omissions stripped Mr. Jackson of virtually every means of self-protection;

    d.  acts and/or omissions foreclosed Mr. Jackson's access to outside aid;

    e.  conduct inflicted unnecessary and wanton pain on Mr. Jackson until his death; and

    f.  conduct evidenced their respective wanton disregard for Mr. Jackson's serious medical needs.

108.    Defendants' refusals to treat Mr. Jackson's objectively serious and readily identifiable need for medical care constitute deliberate indifference thereto.

109.    Defendants' conduct was the moving force behind their respective and collective serious deprivations of Mr. Jackson's rights.

110.    Defendants acted with a sufficiently culpable state of mind to satisfy the dictates of *Farmer v. Brennan.*

111.    Defendants:

    a.  were charged with the supervision of inmates at the Coffield Unit;

b.  were charged with providing medical care to said inmates;

c.  had a subjective knowledge of a risk of serious harm to Mr. Jackson;

d.  disregarded the risk of serious harm to Mr. Jackson;

e.  acted with more than gross negligence with regard to Mr. Jackson's constitutional rights;

f.  were aware of facts from which the inference of serious harm to Mr. Jackson could be drawn;

g.  actually drew the inference that said serious harm would befall Mr. Jackson if they respectively and/or collectively continued to disregard Mr. Jackson's serious, open, and obvious medical needs;

h.  denied Mr. Jackson's access to medical care;

i.  acted in an unconstitutionally reckless manner;

j.  acted in a manner with regards to Mr. Jackson's medical needs that was not related to a legitimate governmental interest;

k.  saw Mr. Jackson suffering from the classic symptoms of diabetic ketoacidosis;

l.  saw Mr. Jackson suffering from the classic symptoms of a condition requiring medical attention;

m.  deprived Mr. Jackson of the minimal civilized measure of life's necessities;

n.  had duties to provide adequate medical care which were not negated by any legitimate government interest;

o.  are responsible for providing (*inter alia*) medical screening, medical treatment, and administering necessary medications;

p.  (as non-medical personnel) denied Mr. Jackson access to medical care;

     q.   violated their respective duties to refrain from arbitrarily punishing Mr. Jackson;

     r.   were inadequately trained and/or supervised;

     s.   used their own deficient judgment to discern that a clearly dying man did not deserve/require medical attention;

     t.   systematically denied Mr. Jackson with access to reasonable medical care;

     u.   had supervisors who had a duty to carefully hire, train, and supervise personnel capable of identifying the reasonably obvious medical needs of prisoners;

     v.   unnecessarily and wantonly inflicted pain and suffering upon Mr. Jackson; and

     w.   were deliberately indifferent to Mr. Jackson's medical needs.

112.   This is not a case where reasonable minds could differ as to whether or not Defendants' conduct constituted reasonable medical care.

113.   Upon information and belief, circumstantial evidence exists herein from which a factfinder could conclude that one or more jail officials knew of the substantial risk to Mr. Jackson.

114.   Specifically, the Defendants' respective, collective, and unconstitutional failures to provide reasonable medical care to a dying man over the course of nine hours (despite having actual notice of his obvious need for medical care) was open and obvious to every reasonable person.

115.   Defendant Rupert inadequately trained and/or supervised his subordinates as evidenced by the fact that his jail personnel permitted an obviously ill prisoner to die rather than provide a semblance of medical care.

116.   The Coffield Unit's relevant procedures, policies, and/or customs are:

    a.   patently inadequate to prevent arbitrary punishment of inmates in need of life-saving medical care;

    b.   patently inadequate to prevent the jail personnel from unilaterally deciding that clearly dying inmates do not deserve/require medical care; or

    c.   systematically ignored by correctional officers therein.

117.   Specifically, Defendants Christensen and Brown consistently ignored actual notice that Mr. Jackson required medical attention and refused to give him medical care.

118.   Therefore, the policies, practices, or customs (or lack thereof) created or accepted under Defendant Rupert's supervision caused Mr. Jackson's death insofar as Coffield Unit officers consistently refused to provide Mr. Jackson with medical care despite having actual knowledge that he required it in order to continue living.

119.   The level of medical care provided to Mr. Jackson while he was dying in Defendants' custody was not reasonably related to a legitimate government objective and therefore constituted punishment in violation of the Fourteenth Amendment.

120.   Additionally and/or alternatively, Defendants arbitrarily punished Mr. Jackson when they consistently refused to provide him with medical attention despite having actual or constructive notice that he required same in order to continue living.

121.   Under the facts herein, Defendants' duties to Mr. Jackson were systematically ignored via their consistent denial of medical attention to Mr. Jackson over a nine-hour period of time despite the known likelihood that:

    a.   someone who requires life-saving medical attention will die if they do not receive it within a reasonable period of time; and

    b. nine hours is an unreasonable amount of time to wait to provide someone with life-saving medical attention.

122. Defendants deliberately or recklessly deprived Mr. Jackson of life-saving medical attention in a manner that was:

    a. materially inconsistent with the concept of reasonable medical care;

    b. constitutionally inadequate;

    c. deliberately indifferent to his known need for medical care; and

    d. exceedingly dangerous for an inmate who required life-saving medical attention.

123. Defendants' acts and omissions violated Mr. Jackson's right to remain free from unreasonably punitive measures.

124. Mr. Jackson suffered from a medical condition that:

    a. a reasonable doctor or patient would find worthy of comment or treatment;

    b. significantly affected his daily activities;

    c. would not have caused death if treated with reasonable medical care; and

    d. caused Mr. Jackson chronic and substantial pain over a nine hour period.

125. Under the circumstances herein, Defendants Christensen and Brown must have been aware of the significant risk of injury to Mr. Jackson in the event he was not provided with reasonable medical care.

126. Defendant Rupert must have been aware that the policies, practices, or customs within the Coffield Unit were either (1) inadequate for the preservation of its inmates' civil rights or (2) flagrantly disregarded by its officers.

127. The actual injury sustained by Mr. Jackson (*i.e.*, death) was foreseeable and preventable under the facts herein.

128.   Defendants deliberately created a condition of confinement in which the inference of harm to Mr. Jackson must have been apparent during all phases of Defendants' failure/refusal to provide him with constitutionally mandated medical care.

129.   Mr. Jackson would not have died but for Defendants' reckless and deliberate indifference in maintaining proper prison conditions and policies concerning the provision of medical treatment to inmates under similar circumstances.

130.   Defendants' failures exceed constitutional tolerances concerning the provision of medical attention to an incoherent inmate suffering from progressive diabetic ketoacidosis over the course of nine hours until he died therefrom.

131.   No reasonable officer would ever believe Defendants' relevant acts or omissions were reasonable.

132.   Defendant Christensen's admission to Laster evidence his belief that the conduct herein was unreasonable, thereby foreseeably preventing him from prevailing via qualified immunity.

133.   Defendants' respective and collective conscious decisions to ignore Mr. Jackson's medical condition despite the obviousness of his need for medical care permit the factfinder(s) herein to infer deliberate indifference.

134.   Further, the individual Defendants cannot prevail via qualified immunity because a fourteen minute failure to render medical care to an inmate with an urgent medical need and without a constitutionally permissible explanation has been considered to be so constitutionally unreasonable that it was actionable as a matter of law; Defendants' nine-hour delay was 38.5 times the previously found to be unreasonable fourteen minute

delay, and therefore cannot possibly be considered reasonable under the facts herein by any reasonable and competent juror.

135.     Plaintiff seeks punitive damages against Defendants Christensen and Brown because they:

    a.   knew Mr. Jackson required medical care;

    b.   acted with conscious indifference to the probability that Mr. Jackson would die without reasonable medical care;

    c.   acted with reckless or callous indifference to Mr. Jackson's federally protected rights;

    d.   acted with deliberate indifference to the likelihood that they would violate Mr. Jackson's constitutional rights by unreasonably and consistently refusing to provide him with reasonable medical care;

    e.   recklessly trampled on Plaintiff's clearly established constitutional rights through plainly unlawful conduct; and/or

    f.   acted in a grossly negligent manner.

### CLAIM 2 – 42 U.S.C. § 1983

### Defendant Rupert is culpable for his unconstitutional failures/refusals to train/supervise his correctional officers in a manner that ensured inmates at the Coffield Unit reasonably received life-saving medical care

136.     The foregoing paragraphs are incorporated herein as if quoted verbatim.

137.     A not-insignificant number of inmates have died while in Defendant's custody at the Coffield Unit due to an unconstitutional failure to provide dying inmates with reasonable

medical care; Plaintiff avers this specific fact is likely to have evidentiary support after a reasonable opportunity for discovery.

138. This pattern of similar failures/refusals to provide inmates with reasonable medical care resulting in death independently provided Defendant Rupert with notice that his jailors were unreasonably failing to provide inmates with reasonable access to life-saving medical care.

139. Upon information and belief, at least some of the custodial deaths that have occurred at the Coffield Unit under Defendant Rupert's supervision resulted in an investigation which demonstrated that the jailors therein were unreasonably failing or refusing to provide inmates with reasonable life-saving medical care.

140. Defendant Rupert knew to an absolute certainty that his jailors:

    a. would be confronted with situations in which inmates required life-saving medical care;

    b. were confronted with situations where inmates required life-saving medical care;

    c. were investigated for their acts and omissions that led to custodial deaths at the Coffield Unit;

    d. were inadequately supervised and/or trained in a manner that resulted in an unconstitutional failure to reasonably identify inmates' needs for life-saving medical care;

    e. were inadequately supervised and/or trained in a manner that resulted in an unconstitutional failure to reasonably provide inmates with life-saving medical care; and

     f.    acted and failed to act in a manner that caused inmates to die in his custody that would not have died if they had been provided with reasonable medical care.

141.   Despite his actual notice that a not-insignificant number of inmates have died in custody while in custody at the Coffield Unit due to his officers' failures/refusals to provide inmates with reasonable medical care, Defendant Rupert:

     a.    failed to train or supervise his correctional officers in a manner that reasonably ensured they would provide inmates at the Coffield Unit with reasonable medical care;

     b.    failed to train or supervise his correctional officers in a manner that prevented them from imposing unnecessary pain and suffering on inmates through the failure/refusal to provide reasonable medical care;

     c.    created, perpetuated, and/or allowed an unreasonably unconstitutional policy, practice, or custom of correctional officers at the Coffield Unit failing/refusing to provide reasonable medical care to inmates;

     d.    had knowledge/notice of the alleged unconstitutional conditions at the Coffield Unit;

     e.    acted with deliberate indifference to the known and/or obvious consequences of failing to ensure that correctional officers at the Coffield Unit were reasonably trained/supervised in a manner that ensured inmates who were suffering from treatable conditions in his custody would not unreasonably die therefrom; and

     f.    acted with deliberate indifference to the known and/or obvious consequences of failing to ensure that correctional officers at the Coffield Unit were reasonably

trained/supervised in a manner that ensured inmates who were suffering from treatable conditions in his custody would receive reasonable medical care.

142.   Despite having actual notice of the unconstitutional conditions at the Coffield Unit which were predicated upon his failures to supervise/train his correctional officers, Defendant Rupert chose to refrain from taking corrective action (via, *e.g.,* supervision or training) to ensure that said officers would provide inmates who were dying in his custody with reasonable medical care.

143.   Defendant Rupert's affirmative choice to refrain from training/supervising his correctional officers in a manner that was reasonably calculated to ensure inmates at the Coffield Unit who were dying from treatable conditions received reasonable life-saving medical care constitutes deliberate indifference.

144.   Defendant Rupert acted unreasonably in dealing with the jail conditions at the Coffield Unit that he knew (or should/must have known) to be unconstitutionally dangerous or inhumane.

145.   A reasonable official under similar circumstances would supervise, train, or discipline his jailors in a manner that reasonably ensured inmates in custody would receive critical medical care.

146.   Defendant's responses to his jailors' relevant acts and omissions (e.g., failure/refusal to supervise or train his jailors in a manner that reasonably ensured inmates in his custody would reasonably receive life-saving medical care) was so unconstitutionally unreasonable under the circumstances herein that no reasonable official in his position would ever believe that such responses were reasonable.

147.   Defendant's conduct under the circumstances was:

    a. deliberately indifferent to Mr. Jackson's constitutional right to receive reasonable medical care while in the Defendant's custody;

    b. a repudiation of Mr. Jackson's constitutional rights under color of law;

    c. a conscious decision to ignore the known or obvious risk of not ensuring that inmates received reasonable medical care in a reasonably timely manner;

    d. certain to proximately cause unreasonable deprivations of his inmates' constitutional rights under color of law; and

    e. an intentional choice to avoid ensuring that his jailors understood the importance of providing reasonable medical care to inmates who were dying in his custody.

148. Under the circumstances:

    a. it was obvious that the likely consequences of choosing to refrain from ensuring that jailors understand the importance of providing reasonable medical care to inmates who were dying while incarcerated in the Coffield Unit would constitute a deprivation of constitutional rights under color of law;

    b. it would have been clear to any reasonable person in a comparable situation that condoning or ratifying a policy, practice, or custom similar to the one at issue herein would in fact ensure that inmates would not receive reasonable access to critical medical care;

    c. it was obvious that the jailors at the Coffield Unit displayed unconstitutional deliberate indifference to the inmates therein that required life-saving medical care;

    d.   Defendant's acquiescence to his jailors' unconstitutional failures to provide reasonable medical care was plainly incompetent or a knowing violation of the law;

    e.   Defendant's conduct was objectively unreasonable;

    f.   Defendant created or approved dangerous conditions (*e.g.,* his jailors' unconstitutional failures or refusals to provide reasonable medical care to dying inmates) which proximately caused Mr. Jackson's death and refused to remedy same;

    g.   Defendant was on notice that his jailors required additional training/supervision concerning the provision of reasonable medical care to dying inmates;

    h.   Defendant's failure to train/supervise his jailors resulted in the highly predictable consequence that was the moving force behind the deprivation of Mr. Jackson's constitutional right to reasonable medical care under color of law;

    i.   Defendant's jailors were not properly supervised/trained with respect to identifying inmates who required critical medical care; and

    j.   Defendant's jailors were not properly supervised/trained with respect to providing inmates with reasonable medical care.

149.   Plaintiff seeks punitive damages against Defendant Rupert because he:

    a.   knew his correctional officers regularly and unreasonably failed to provide inmates at the Coffield Unit with life-saving medical care;

    b.   acted with conscious indifference to the probability that inmates in the Coffield Unit's custody would die without reasonable medical care;

    c.   acted with reckless or callous indifference to Mr. Jackson's federally protected rights;

    d.   acted with callous indifference to the likelihood that the correctional officers under his supervision would violate inmates' constitutional rights by unreasonably failing to identify inmates who required life-saving medical care;

    e.   acted with callous indifference to the likelihood that the correctional officers under his supervision would violate inmates' constitutional rights by unreasonably failing/refusing to provide inmates with reasonable medical care;

    f.   recklessly trampled on Plaintiff's clearly established constitutional rights through plainly unlawful conduct (*e.g.,* refusing to ensure that correctional officers under his supervision reasonably identified inmates who required life-saving medical care and provided them with same); and/or

    g.   acted in a grossly negligent manner.

## VIII.   DAMAGES

150.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injuries and damages (*i.e.,* the prolonged suffering and death of Mr. Jackson).

151.   Plaintiff therefore seeks compensatory damages (including actual damages, legal fees, and mental distress damages), presumed damages, nominal damages, and punitive damages.

## IX.   ATTORNEYS' FEES

152.   Upon prevailing in this matter, Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 1988.

## X.   PRAYER

153.   For these reasons, Plaintiff asks for judgment against Defendants for the following:

    (a)    actual damages;

    (b)    emotional distress damages;

    (c)    mental distress damages;

    (d)    punitive damages;

    (e)    presumed damages;

    (f)    nominal damages;

    (g)    reasonable attorney fees;

    (h)    costs of suit; and

    (i)    all other relief to which Plaintiff may be entitled, both at law and in equity.

`

Respectfully submitted,


By: */s/ Meagan Hassan*
Meagan Hassan
Lead Attorney
Texas Bar No. 24065385
Email: meagan.hassan@demondhassan.com

William Pieratt Demond
Texas Bar No. 24058931
Email: william.demond@demondhassan.com

DEMOND & HASSAN, PLLC
2450 Louisiana St., Suite 400-528
Houston, Texas 77006
Tel: 713.701.5240
Fax: 713.588.8407

ATTORNEYS FOR PLAINTIFF